STATE OF LOUISIANA                    NO. 24-K-20

VERSUS                                FIFTH CIRCUIT

CORTEZ JOSEPH                         COURT OF APPEAL

                                      STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Linda Wiseman
First Deputy, Clerk of Court

February 05, 2024

Linda Wiseman
First Deputy Clerk

**IN RE** STATE OF LOUISIANA

**APPLYING FOR** SUPERVISORY WRIT FROM THE FORTIETH JUDICIAL DISTRICT COURT, PARISH OF ST JOHN THE BAPTIST, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE VERCELL FIFFIE, DIVISION "A", NUMBER 21,388

Panel composed of Judges Susan M. Chehardy,
Stephen J. Windhorst, and John J. Molaison, Jr.

**WRIT GRANTED; JUDGMENT REVERSED**

In this writ application, the State seeks review of the trial court's November 13, 2023 judgment granting the defendant's motion to suppress evidence. For the reasons that follow, we grant the State's writ application and reverse the trial court's judgment suppressing the evidence.

*Procedural History*

On November 9, 2021, the St. John the Baptist Parish District Attorney filed a bill of information charging defendant, Cortez Joseph, with possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1, possession of MDMA in violation of La. R.S. 40:966(C), and possession of a firearm while in possession of a controlled dangerous substance in violation of La. R.S. 14:95(E).

24-K-20

On June 15, 2022, the arresting officer testified at a preliminary examination hearing.[1] Lieutenant Joshua Gilboy with the St. John the Baptist Parish Sheriff's Office traffic division stated that on October 29, 2021, he saw defendant driving a tan Chevy Tahoe, traveling east on Captain G. Bourgeois Street in LaPlace. He noticed that the vehicle had a tinted cover over the license plate. Lieutenant Gilboy notified Captain Michael Gil that he was conducting a traffic stop, and Captain Gil advised him that the same vehicle possibly was involved in a shooting that took place on Carmichael Lane earlier that day. Lieutenant Gilboy initiated a traffic stop and, because of defendant's alleged involvement in the shooting earlier that day, instructed defendant to exit the vehicle and asked for assistance on his radio. Defendant did not get out of the vehicle and instead fled the scene, speeding south on Elm Street, then making a right turn onto Highway 44 and another right turn into a church parking lot. Defendant drove into the field behind the church, put his vehicle in reverse, jumped out, and fled on foot. Lieutenant Gilboy stated that defendant ran east and dropped what appeared to be a black handgun with an extended magazine. Before pursuing defendant, Lieutenant Gilboy needed to stop defendant's vehicle from hitting his own. When he entered defendant's vehicle to put it in park, he observed a black gun, which he believed to be a Smith & Wesson, near the foot pedals. He then pursued defendant on foot, eventually apprehending him east of Pine Street. After Lieutenant Gilboy advised defendant of his rights, defendant said: "they shot him at first, I was shooting in self-defense." Lieutenant Gilboy collected the handgun that defendant had dropped earlier.

Lieutenant Gilboy stated that while Deputy Nico Paretti was transporting defendant to the criminal investigation division for questioning, defendant

---

[1] The trial court's August 10, 2023 written judgment issued after the preliminary examination is not properly before this Court for review, but we discuss it in depth because, as seen below, the trial court relies upon this judgment heavily in supporting its November 13, 2023 judgment on the motion to suppress.

admitted that he was involved in a shooting on "The Shack Street," which was a common term for Carmichael Lane. Lieutenant Gilboy explained that because he saw the handgun in the vehicle, and because defendant was a convicted felon, he obtained a search warrant for the vehicle after it was towed to a secure location. During the subsequent search of the vehicle, deputies found the gun on the floorboard, which had been reported stolen at the East Baton Rouge Sheriff's Office, and two digital scales, which were inside of a black backpack. Lieutenant Gilboy further testified that during booking, deputies located a bag of twenty-seven pills in defendant's pocket, which they subsequently field-tested positive for MDMA or Ecstasy. He then "booked [defendant] on everything that wasn't involved in the shooting." *Id.* at 18.

On cross-examination, Lieutenant Gilboy explained that he stopped defendant because he had a tinted license plate cover, and because "47:507" provides that a "plate must be clearly visible and free of foreign material." Lieutenant Gilboy denied that he could clearly see the plate: "It was tinted and I was at an angle because I was in a Charger and he was in a Tahoe, so from that angle I couldn't see it clearly." He said, "And also, it's a reflective material so when the light shines on it I couldn't clear see it[.]" Lieutenant Gilboy stated that because it was a foreign material, plastic, it was not supposed to be on the plate and was a violation of the statute. When asked if he would be able to clearly see the plate in a different vehicle, Lieutenant Gilboy responded: "From a distance no, because it's tinted and because it's a reflective material." He testified that his initial basis for stopping defendant would be included in his report, but he did not believe the report referenced the statute.[2] He further explained that based on what Captain Gil relayed to him, the subject was stopped for reasonable suspicion of

_____

[2] Lieutenant Gilboy referred to the first paragraph of his report, which stated: "Lieutenant Gilboy was unable to read the license plate due to license plate cover."

involvement in a shooting. Lieutenant Gilboy did not know what evidence of the vehicle's involvement in the shooting Captain Gil had obtained. He indicated that he knew only that Captain Gil was the shift supervisor on duty at the time of the shooting. He denied that Captain Gil gave him a description of the person driving the vehicle.

The trial court then informed the parties that the referenced statute was repealed in 2014. Lieutenant Gilboy believed that he verified the statute before making the stop, indicating that he checked the "statute book" and that he was not aware that the statute had been repealed. The trial court then *sua sponte* questioned Lieutenant Gilboy. The court indicated that Lieutenant Gilboy did not answer defense counsel's question of whether he could view the license plate if he was at a different angle. Lieutenant Gilboy reiterated that when he was "up close," he was able to see the license plate clearly, but from a distance, because of the tint, the reflective material, and his angle, he could not clearly see the license plate.

On August 10, 2022, the trial court issued a written judgment finding that "probable cause did NOT exist for the original stop …. A faulty stop initiated the arrest and the officer's testimony supports that no probable cause existed prior to the initiation of the stop."[3]

The defendant subsequently filed a motion to suppress evidence. On October 11, 2023, the trial court held a suppression hearing, at which the State relied upon Officer Gilboy's testimony from the June 15, 2022 preliminary examination hearing.

---

[3] In the August 10, 2023 judgment, the trial court stated that the officer provided "conflicting testimony" about whether he could see the license plate, and found that this conflicting testimony did not establish that an infraction existed before the traffic stop. The trial court further stated that the information of the vehicle's possible involvement in a murder, without any specificity, did not warrant the traffic stop, and identification of the vehicle was insufficient, as "no specificity traversed the conversation" between Lieutenant Gilboy and Captain Gil. The court stated that the officer's failure to put himself in a proper position to consistently view the license plate did not establish probable cause, especially where the officer indicated that it was not the defendant's fault.

On November 13, 2023, relying upon its August 10, 2023 judgment from the preliminary examination finding that the officer lacked probable cause for the initial stop, the court issued a written judgment granting defendant's motion to suppress. The judgment stated that "any evidence obtained as a result of the faulty/questionable stop shall be inadmissible and suppressed" under the "fruit of the poisonous tree" doctrine. Further, the trial court's stated that its finding of no probable cause for the initial stop "undermines any argument that the plain view doctrine could justify the seizure of evidence."

On December 12, 2023, the State filed its Notice of Intent to Seek Writs on the trial court's ruling that suppressed evidence. The trial court declined to issue an Order setting a return date, instead issuing a December 19, 2023 Order that stated: "DENIED. Application filed more than 30 days after the August 10, 2023 judgment conformed." On January 12, 2024, the State filed its writ application in this Court.

*Discussion*

At the outset, we acknowledge that the State's writ application is untimely on its face, as it was filed more than 30 days from the date of the November 13, 2023 judgment. However, on December 12, 2023, the State timely filed a Notice of Intent to Seek Writs, and the trial court erroneously "denied" the Notice, refusing to set a return date after mistakenly referencing the court's August 10, 2023 date of the preliminary examination ruling instead of the November 13, 2023 judgment regarding suppression of evidence.

Rule 4–3 of the Uniform Rules–Courts of Appeal, provides:

> Upon proper showing, the trial court or the appellate court may extend the time for filing the application upon the filing of a motion for extension of return date by the applicant, filed within the original or an extended return date period. An application not filed in the appellate court within the time so fixed or extended shall not be

considered, in the absence of a showing that the delay in filing was not due to the applicant's fault.

Given these unique circumstances, we find the trial court's refusal to set a return date for filing the State's writ application constitutes "a showing that the delay in filing was not due to the applicant's fault." Uniform Rules–Courts of Appeal, Rule 4–3. We therefore vacate the trial court's order denying the State's notice of intent and extend the time by which the State was required to file its writ application to January 12, 2024, the date on which the State filed its writ application.

In consideration of the merits of the State's writ application, we find the trial court erred in granting defendant's motion to suppress.

The United States Constitution and the Louisiana Constitution protect the public against unreasonable searches and seizures. U.S. Const. amend. IV; La. Const. art. 1, § 5. As such, searches and seizures generally must be conducted pursuant to a validly executed search warrant or arrest warrant. *State v. Holmes*, 08-719 (La. App. 5 Cir. 3/10/09), 10 So.3d 274, 278, *writ denied*, 09-816 (La. 1/8/10), 24 So.3d 857. Warrantless searches and seizures are *per se* unreasonable unless justified by one of the exceptions to the warrant requirement. *Id.* A defendant who is adversely affected may move to suppress evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. C.Cr.P. art. 703(A). When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the State bears the burden of proving that the search and seizure was justified pursuant to one of the exceptions to the warrant requirement. La. C.Cr.P. art. 703(D); *State v. Joseph*, 02-717 (La. App. 5 Cir. 6/27/03), 850 So.2d 1049, 1052, *writ denied sub nom. State ex rel. Joseph v. State*, 04-2404 (La. 6/17/05), 904 So.2d 686. A search incident to a lawful arrest is one of the clearly recognized exceptions to a warrantless search. *Id.* at 1051. The trial court is afforded great discretion in ruling on a motion to

suppress, and its ruling will not be disturbed absent an abuse of that discretion. *State v. Welch*, 11-0274 (La. 4/29/11), 60 So.3d 603.

The November 13, 2023 judgment focuses on the court's previous determination that the officer lacked probable cause for the initial stop, rendering the traffic stop unlawful. Yet the trial court's determination that the traffic stop was unlawful is erroneous. La. C.Cr.P. art. 215.1 recognizes the right of law enforcement officers to stop and interrogate those reasonably suspected of engaging in criminal activity – a right squarely recognized in state and federal jurisprudence. *See*, *e.g.*, *State v. Mitchell*, 10-334 (La. App. 5 Cir. 10/26/10), 52 So.3d 155, 158, *writ denied sub nom. State ex rel. Mitchell v. State*, 11-355 (La. 12/2/11), 76 So.3d 1170 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Belton*, 441 So.2d 1195, 1198 (La. 1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984)). Pursuant to the investigatory stop recognized by the United States Supreme Court in *Terry*, *supra*, a police officer may briefly seize a person if the officer has an objectively reasonable suspicion, supported by specific and articulable facts, that the person is, or is about to be, engaged in criminal conduct or is wanted for past criminal acts. *State v. Carter*, 20-1193 (La. 1/26/21), 309 So.3d 333, 336.

Reasonable suspicion is something less than probable cause to arrest, though it is more than an officer's mere unparticularized suspicion or hunch of criminal activity. *State v. Molette*, 11-384 (La. App. 5 Cir. 11/29/11), 79 So.3d 484, 489. In determining whether a police officer had reasonable suspicion, a reviewing court must consider the totality of the circumstances and give deference to the inferences and deductions of a trained police officer that might elude an untrained person. *Id.* (citing *State v. Burns*, 04-175 (La. App. 5 Cir. 6/29/04), 877 So.2d 1073, 1076)).

Traffic violations serve as valid bases for investigatory stops. *State v. Leonard*, 06-361 (La. App. 5 Cir. 10/31/06), 945 So.2d 764, 766. The fact that an

officer does not issue a traffic citation is irrelevant to the constitutionality of the stop. *State v. Williams*, 13-732 (La. App. 5 Cir. 3/26/14), 138 So.3d 727, 732.

When an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable, regardless of the officer's subjective motivation. *State v. Hunt*, 09-1589 (La. 12/1/09), 25 So.3d 746, 753 (citing *Whren v. United States*, 517 U.S. 806, 810, 813, 116 S.Ct. 1769, 1772, 1774, 135 L.Ed.2d 89 (1996)). The standard is purely objective and does not take into consideration the subjective beliefs or expectations of the detaining officer. *State v. Martin*, 11-160 (La. 12/28/11), 83 So.3d 230, 237. "Although they may serve, and may often appear intended to serve, as the prelude to the investigation of much more serious offenses, even relatively minor traffic violations provide an objective basis for lawfully detaining the vehicle and its occupants." *State v. Waters*, 00-356 (La. 3/12/01), 780 So.2d 1053, 1056. Evidence derived from an unreasonable stop will be excluded from trial, however. *State v. Taylor*, 12-25 (La. App. 5 Cir. 6/28/12), 97 So.3d 522, 529.

Lieutenant Gilboy testified that he initiated the traffic stop because the vehicle had a tinted license plate cover, which was not clearly visible and had foreign materials, citing La. R.S. 47:507. As explained at the preliminary hearing, La. R.S. 47:507 was repealed in 2014, but its contents were inserted verbatim into La. R.S. 32:53. *See United States v. Henry*, 853 F.3d 754, n.7 (5th Cir. 2017). According to La. R.S. 32:53(A)(3): "Every permanent registration license plate shall at all times be … in a place and condition to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible." That statute further provides: "Unless authorized by the commissioner, a person shall not apply a covering or any substance to the license plate or use an electronic device or eletrochromatic film that obscures from any angle the numbers,

characters, year registration sticker, or name of the jurisdiction issuing the plate." *See* La. R.S. 32:53(A)(3).

The traffic stop in this case was valid because, as Lieutenant Gilboy explained at the preliminary examination, he observed a statutory violation where defendant had a tinted cover over his license plate. Lieutenant Gilboy denied that he could clearly see the license plate with the covering, explaining that he could not see it from his angle. He further explained the plate had a reflective material that he could not see clearly.

The trial court mistakenly failed to acknowledge that although La. R.S. 47:507 was repealed in 2014, its language prohibiting a license plate cover was made part of La. R.S. 32:53, which remains in effect. Moreover, the trial court erroneously focused on Lieutenant Gilboy's allegedly conflicting testimony, noting that he could see the license plate "at different angles, but could not at other angles" – testimony that does not invalidate the stated reason for the stop.

In *United States v. Glenn*, 204 F.Supp.3d 893, 899 (M.D. La. 2016), the sergeant claimed that he initiated the traffic stop because a tinted license plate cover was affixed to the vehicle in violation of Louisiana law. The sergeant testified that he could not see the information on the license plate when his cruiser was parked on the 1-10 median. After he pulled behind the vehicle, however, the headlights of his police cruiser illuminated the plate and he was able to read it. *Id.* at 900. The district court determined that the fact that the sergeant was able to read the license plate (with the help of his headlights) immediately before the stop did not invalidate his stated reason for the stop. The sergeant had reasonable suspicion that a traffic violation occurred and thus was justified in making the stop. *Id*. *See also United States v. Bates*, 2013 WL 796064, at *4-5 (E.D. La. Mar. 4, 2013) (finding that a traffic stop for an obscured license plate was justified even though the officer was eventually able to read the license plate).

Moreover, Louisiana jurisprudence indicates that the officer's interpretation, even if mistaken, was objectively reasonable. In *State v. Pena*, 43,321 (La. App. 2 Cir. 7/30/08), 988 So.2d 841, 844, the appellate court considered whether an officer had reasonable suspicion to stop a vehicle based on, among other things, improper display of a license plate. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur, before stopping the vehicle." *Id*. at 846. When an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable. *Id*. The court found that even where the license plate was only partially obscured, and most of the vehicle's windows, but not all, were tinted very dark, the trooper was justified in stopping the vehicle to further investigate a possible infraction. *Id*. at 847.

Here, Lieutenant Gilboy was justified in stopping defendant's vehicle to investigate the perceived infraction, even if defendant's license plate could be seen at different angles. That Lieutenant Gilboy referred to a repealed statute is of no moment considering that repealed statute's content was inserted verbatim into La. R.S. 32:53, the statute in effect at the time of this traffic stop. *See United States v. Henry*, 853 F.3d 754 n.7.

Furthermore, Lieutenant Gilboy was justified in conducting a stop of the vehicle that he believed had been involved in a prior shooting, per his telephone conversation with Captain Gil; reasonable suspicion has been found to exist under similar circumstances. For example, in *State v. Kang,* 01-1262 (La. App. 5 Cir. 2/23/04), 866 So.2d 408, 413, *writ denied,* 04-944 (La. 11/24/04), 888 So.2d 226, this Court found that reasonable suspicion existed to support an investigatory stop of a vehicle where the detective on patrol heard a radio dispatch indicating that a black Lexus containing three Asian males was sought in connection with a

10

shooting. The detective stopped a black vehicle with Asian male occupants. Although the vehicle was a Honda and not a Lexus, this Court determined that the officer's training and experience justified a continuation of the investigatory stop.

Similarly, in *State v. Burton*, 11-1023 (La. App. 5 Cir. 5/22/12), 98 So.3d 375, 380-81, *writ denied*, 12-1422 (La. 1/11/13), 106 So.3d 547, the detective was aware that an armed robbery had just been committed in the vicinity. He then spotted a vehicle that generally matched the description of the vehicle in the armed robbery and began to follow it. Considering the totality of the circumstances, including the facts that the defendant's vehicle matched the description of the vehicle used in the armed robbery, that a relatively short amount of time had passed between the armed robbery and the time the vehicle was spotted, and that the location of the robbery was in the general vicinity of the officer's location, this Court determined that the officer had reasonable suspicion to stop the vehicle for further investigation. *Id*. at 881. *See also State v. Cooper*, 45,568 (La. App. 2 Cir. 12/8/10), 55 So.3d 873, 879-80 (finding that the officer possessed the requisite probable cause to initiate a traffic stop of a vehicle for an equipment violation, and because he had a reasonable suspicion that the same individuals had just committed an armed robbery).

Here, Lieutenant Gilboy testified that before stopping defendant, he informed Captain Gil that he would initiate a traffic stop for the tinted license plate cover and provided a description of the vehicle. Captain Gil told him that this vehicle possibly was involved in a shooting that had occurred earlier that morning. Lieutenant Gilboy's testimony establishes that he was well within his authority to stop the vehicle based upon a reasonable suspicion that the vehicle had been involved in a shooting earlier that day.

In short, the license plate violation rendered the traffic stop a valid stop. The fact that Captain Gil informed Lieutenant Gilboy that the vehicle possibly was

11

involved in a shooting earlier that day constituted an additional justification for stopping the vehicle for further investigation. *See Cooper*, 55 So.3d at 879-80. The traffic stop was not unlawful. As such, the trial court abused its discretion in granting defendant's motion to suppress the evidence obtained as a result of the valid stop. The November 13, 2023 judgment granting defendant's motion to suppress is reversed.

Gretna, Louisiana, this 5th day of February, 2024.

**SMC**
**SJW**
**JJM**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **02/05/2024** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**24-K-20**

**CURTIS B. PURSELL**
CLERK OF COURT

**E-NOTIFIED**
40th District Court (Clerk)
Honorable Vercell Fiffie (DISTRICT JUDGE)
Anthony J. Ibert (Relator)

Honorable Bridget A. Dinvaut (Relator)
Randy J. Dukes (Respondent)

**MAILED**